UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JEARD BALLEW and
WILLIAM D. GILSTRAP,

      Plaintiffs,

v.

                            Case No.: 2:21-cv-747-JLB-NPM

STANDARDAERO BUSINESS
AVIATION SERVICES, LLC,

      Defendant.

_____/

## ORDER

This is a consolidated liability action arising from an aviation accident that

occurred when the landing gear of the subject aircraft failed to operate properly.

Pending before the Court are Defendant StandardAero Business Aviation Services,

LLC's *Daubert* Motion to Exclude Opinions and Testimony of Donald E. Sommer

(Doc. 60) (the "Sommer *Daubert* Motion"), Defendant's *Daubert* Motion to Exclude

Expert Opinions and Testimony of William M. Clark, Ph.D (Doc. 61) (the "Clark

Daubert Motion"), Defendant's Motion for Summary Judgment (Doc. 62), Plaintiff's

(Corrected) *Daubert* Motion to Preclude Testimony from Defendants' Proposed

Expert Witness Paris Michaels (Doc. 64), Plaintiff's *Daubert* Motion to Preclude

Testimony from Defendants' Proposed Expert Economist Cynthia Stephens (Doc.

65), and Plaintiffs' *Daubert* Motion to Preclude Testimony from Defendants'

Proposed Expert C. Dennis Moore (Doc. 66).  Having carefully considered the record,

the Court **DENIES** Defendant's Motion for Summary Judgment, and **DENIES without prejudice** the remainder of the pending motions, as set forth more fully below.

## BACKGROUND

On October 7, 2019, a Raytheon Hawker 800XP Aircraft, N86MN (the "Aircraft"), landed with its nose landing gear ("NLG") retracted at Southwest Florida International Airport in Fort Myers, Florida.  (Doc. 62-5 at 1; Doc. 62-8 at 5; Doc. 62 at 4; Doc. 72 at 8, ¶ 1).  The Aircraft, which departed from Naples, Florida and was destined for Kerrville, Texas, carried two pilots (Plaintiffs Mr. Ballew and Mr. Gilstrap) and two passengers.  (Doc. 62-3 at 5; Doc. 62 at 4; Doc. 72 at 8, ¶ 2). Defendant indicates that there were no injuries (citing to a deposition of Plaintiffs' expert, Donald Sommer).  (Doc. 62 at 4; Doc. 62-3 at 7).  But Mr. Ballew testified at his deposition that his physical injuries included back and neck pain, headaches, and back pain, that were incurred "during the landing and subsequently getting out of the aircraft."  (Doc. 72-5 at 117, 136).  Mr. Ballew did not seek medical treatment for these injuries.  (*Id.*)  Mr. Gilstrap, in turn, stated at his deposition that he had sore muscles, aches, and pains, and that his back and neck "seem to be more sensitive to things than earlier."  (Doc. 72-6 at 107–08).  He did not seek medical treatment for any of his injuries.  (*Id.*)

After a normal takeoff, the pilots observed a red warning light indicating that the NLG was not fully retracted.  (Doc. 62-8 at 11; Doc. 62 at 4; Doc. 72 at 9, ¶ 4). After several unsuccessful attempts to extend and retract the NLG, the crew

diverted to Southwest Florida International Airport and performed an emergency landing.  (Doc. 62-5 at 1; Doc. 62 at 4; Doc. 72 at 9, ¶ 5).  The crew and passengers safely exited the aircraft.  (Doc. 62-5 at 1 ("We executed an emergency evacuation shutdown and exited the airplane through the normal air stair door without injury. . . . The passengers were in good health and spirits."); Doc. 72-5 at 116, 119; Doc. 62 at 4; Doc. 72 at 9, ¶ 6).

The Aircraft was owned by UYTSAIFLY800XP, LLC in Tulsa, Oklahoma and operated by Delta Private Jets (the "Operator") as an on-demand charter flight. (Doc. 62-6 at 4–5, 10; Doc. 62-7 at ¶ 3).

From December 2018 through January 2019, Defendant performed maintenance work on the Aircraft.  (Doc. 62-7 at ¶ 3; *see also id.* at 4).  Part of this work, according to maintenance records, involved the removal of the Aircraft's NLG assembly and the subsequent reinstallation of an overhauled NLG assembly.  (*Id.* at ¶ 3; *see also id.* at 4).  Carl Thomas, who is the Quality Control Manager for Defendant, is a custodian of records and documents relating to maintenance work performed by Defendant.[1]  (*Id.* at ¶ 2).  Mr. Thomas's declaration states that

---

[1] Plaintiffs argue that Mr. Thomas's affidavit fails to comply with Federal Rule of Civil Procedure 56(c)(4), which requires that affidavits "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  (Doc. 72 at 10).  But Federal Rule of Evidence 803(6) permits the introduction of business records through a custodian.  To be admitted as a business record, "the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest [the documents'] trustworthiness.  *Itel Capital Corp. v. Cups Coal Co., Inc.*, 707 F.2d 1253, 1259 (11th Cir. 1983).  "It is not essential that the offering witness be the recorder or even be certain of who recorded the item.  It is sufficient that the witness be able to

Defendant's personnel "performed their work in accordance with the Hawker 800XP aircraft maintenance manual 32-20-12 and checklists." (*Id.* at ¶ 4; *see also id.* at 4). He also indicates that "a mechanic removed and installed the [NLG] assembly by following Hawker 800XP Aircraft Maintenance Manual section 32-20-12" and that "[t]he mechanic's work was then reviewed and signed off by an inspector confirming that the work was completed correctly." (*Id.* at ¶¶ 6–7; *see also id.* at 4).

Plaintiffs' expert, Mr. Sommer,[2] however, found that Defendant "failed to follow the manufacturer's maintenance instructions published by the airframe manufacturer," that the work done by Defendant "was not inspected properly and was returned to service with a hazardous condition," and that Defendant "failed to follow industry practices to ensure the aircraft was airworthy when released for return to service." (Doc. 72-1 at 13). In support of this finding, Mr. Sommer provided an excerpt of the aircraft maintenance manual, which stated that part of procedure was to "[a]ttach the drag stay to the leg forging with the pin, make sure the flat on the head of the pin engages the flat on the drag stay, install the washer and nut. Tighten the nut and lock with a new split pin." (*Id.* at 7). He indicated

---

identify the record as authentic and specify that it was made and preserved in the regular course of business." *U.S. v. Langford*, 647 F.3d 1309, 1327 (11th Cir. 2011). Mr. Thomas's affidavit states that the maintenance records were prepared and maintained in the course of Defendant's regularly conducted business activity and that the attachments are exact duplicates of the original records. (Doc. 62-7 at ¶¶ 8–10). For purposes of the motion for summary judgment, and because the motion for summary judgment was brought by Defendant rather than Plaintiffs, the Court will assume, without deciding, that Mr. Thomas's affidavit is admissible.

[2] The Sommer *Daubert* Motion is pending before the Court and will be discussed further below.

that "[t]he damage and deformation of the mounting pin and subsequent detachment of the drag link indicate that the cotter pin was not installed at the time of the maintenance event in January 2019." (*Id.* at 11). He noted that "[t]here was no other record of removal of the nut, washer, and cotter pin nor was there any reason for anyone to have altered the condition of this joint." (*Id.*) Finally, Mr. Sommer stated that "[n]ot properly installing the cotter pin as indicating in the AMM indicates a failure to follow the manufacturer instructions as required by the Federal Aviation Regulations . . . ."). (*Id.*) In any event, in the nine months between Defendant's work and the October 7, 2019 incident, the Aircraft flew 124 cycles (a cycle being a takeoff and landing). (Doc. 62-8 at 9; Doc. 72-4 at 57; Doc. 62 at 5; Doc. 72 at 11, ¶ 10). There is no record of evidence of any issues occurring during those 124 cycles.

The aircraft manual sets forth a follow-up inspection requirement to be performed between 25 and 50 cycles after the drag stay has been replaced. (Doc. 62-8 at 9; Doc. 72-4 at 58–59; Doc. 62 at 5; Doc. 72 at 11, ¶ 11). There is no evidence in the record as to whether the Operator completed this follow-up requirement. (Doc. 62-8 at 9; Doc. 72-4 at 59; Doc. 62 at 5; Doc. 72 at 11, ¶ 12). Defendant's expert, Dennis Moore, stated that there was "no indication that the operator . . . or the owner . . . had this inspection accomplished" and that "[t]he aircraft should have been grounded . . . 50 cycles after the NLG drag stay replacement until the inspection had been performed." (Doc. 62-8 at 9). Plaintiff's expert, Mr. Sommer, indicated that his mechanic did not find any mention that the inspection was

performed and that the aircraft should not have been flying if the inspection was not done, "and in that case it apparently wasn't."  (Doc. 72-4 at 59–60).

## LEGAL STANDARDS

### I.   *Daubert* Motion

An expert witness may provide opinion testimony if the proponent of the expert demonstrates to the court that it is more likely than not that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

"Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence."  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n.7, 597 (1993)).  This gatekeeping function aims "to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

In making Rule 702 determinations, district courts are afforded significant discretion.  *Id.* ("[T]he trial judge must have considerable leeway in deciding in a

particular case how to go about determining whether particular expert testimony is reliable.").  Essentially, the Court is tasked with "ensuring that an expert's testimony . . . rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The "burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence."  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  Where the scientific principles underlying an expert opinion are found to lack "evidentiary relevance and reliability," the expert opinion will be found inadmissible.  *Daubert*, 509 U.S. at 595.

Rule 702 was amended in 2023 to, among other things, "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  The advisory committee also noted that the 2023 amendment was necessary because "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility" and that "[t]hese rulings are an incorrect application of Rules 702 and 104(a)."  *Id.*

The Eleventh Circuit has instructed district courts to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or

7

specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998);

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (reaffirming the utility of this "rigorous three-part inquiry" after Rule 702 was amended in 2000 to provide three additional prerequisites (Rule 702(b)–(d)) for admissibility of expert testimony).  While "there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260.  "[T]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 (11th Cir. 2018) (quoting *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005)).

## II.    Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law." *Id.*  "[A] mere scintilla of evidence" does not create a genuine issue of material fact, so a nonmoving party may not simply state that "the jury might, and legally could, disbelieve the moving party's evidence."

*Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (citation and internal quotation marks omitted).

Courts may not make credibility determinations or weigh the evidence when reviewing the record. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("On summary judgment . . . [n]either [the Eleventh Circuit] nor the district court are to undertake credibility determinations or weigh the evidence."). Instead, courts view evidence and draw all reasonable inferences in the nonmoving party's favor. *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002) (citation omitted). But "[a]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." *Zhanadova v. Wal-Mart Stores East, LP*, No. 23-10545, 2023 WL 6534188, at *3 (11th Cir. Oct. 6, 2023) (quoting *Daniels v. Twin Oak Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982)); *see also Hinson v. Bias*, 927 F.3d 1103, 1115 (11th Cir. 2019) ("[W]hile all reasonable inferences must be drawn in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable.") (quotation mark and citation omitted).

## DISCUSSION

### I.   The Sommer *Daubert* motion

Mr. Sommer is the president and owner of Aeroscope, Inc., which is involved in, among other things, forensic engineering and aircraft accident reconstruction. (Doc. 60-1 at 15). Mr. Sommer has participated in analysis and reconstruction of "hundreds of General and Commercial aviation accidents." (*Id.* at 16). From

August 2016 through August 2021, Mr. Sommer participated in twenty-four depositions and thirteen trials. (*Id.* at 19). The Court finds that he is qualified to provide an expert opinion on this matter.

Indeed, the Sommer *Daubert* Motion only challenges the second of the three factors outlined in *City of Tuscaloosa*: the reliability of the methodologies employed by Mr. Sommer in his analysis of whether Defendant failed to install or improperly installed the cotter pin. (Doc. 60 at 5–6).

The reliability of methodology factor "entails a preliminary assessment of whether the reasoning or methodology . . . properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. The reliability of an expert's methodology can be measured by, among other things, "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The expert's methodology "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590 (quotation omitted). It is the Court's responsibility to determine such reliability "in light of the particular facts and circumstances of the particular case." *Kumho*, 526 U.S. at 158.

While *Daubert* requires an exacting analysis, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered

evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341.  Indeed, the Eleventh Circuit has established that "[a] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (quotation omitted).  Instead, "shaky but admissible evidence" should be attacked via "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.  Ultimately, "where experts might reasonably differ," it is the factfinder that "must decide among the conflicting views of different experts." *Kumho*, 526 U.S. at 153 (citing *Daubert*, 509 U.S. at 596).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and the "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Sommer *Daubert* Motion challenges Mr. Sommer's fifth opinion—that "[t]he cotter pin designed to retain the castellated nut for the nose gear drag link was not installed as required in the maintenance instructions and as required for safe operation of the aircraft."  (Doc. 60 at 5 (citing Doc. 60-1 at 13)).  Defendant also asks the Court to exclude four opinions that Defendant suggests are premised upon the conclusion that Defendant either failed to install or improperly installed the cotter pin.  (Doc. 60 at 5–6). The four other opinions are:

> Opinion 4: "The accident aircraft did not conform to its type design and was not in a condition for safe operation and

therefore was not airworthy when it left the control of StandardAero."

. . .

Opinion 6: "Standard Aero failed to follow the manufacturer's maintenance instructions published by the airframe manufacturer."

Opinion 7: "The work done by StandardAero was not inspected properly and was returned to service with a hazardous condition."

Opinion 8: "StandardAero failed to follow industry practices to ensure the aircraft was airworthy when released for return to service."

(Doc. 60 at 5–6).

Defendant's main argument is that Mr. Sommer's opinion is not based on testing, analysis, or reliable data. (Doc. 60 at 6). Instead, Defendant argues, Mr. Sommer simply asserts that "StandardAero *must* not have installed the cotter pin (or installed it improperly) since the mounting pin was found damaged, and no cotter pin was found after the incident." (*Id.*) (emphasis in original). Defendant points out several portions of Mr. Sommer's deposition testimony that it believes show that Mr. Sommer did not consider every possible option. (*Id.* at 6–11). For example, Defendant's attorney asked Mr. Sommer whether he "consider[ed] . . . any other alternatives of why the split pin may have been missing other than it wasn't installed properly or not ever installed?" (Doc. 60-2 at 15). Mr. Sommer responded that he had not. (*Id.*) Defendant also asked Mr. Sommer whether he "ha[s] an opinion one way or the other what it more probable, whether [the cotter pin] was installed improperly or never installed?" (*Id.* at 10). Mr. Sommer responded that it was more probable that the cotter pin was "[n]ever installed, because normally when a mechanic installs a split pin – or when a mechanic installs a nut that

requires a safety device like a split pin, it's done in sequence" and that it was "[m]ore likely that the pin was not installed. It's possible that the nut was not installed, but . . . less likely." (*Id.* at 10–11). Defendant also pointed out that, while it is true that the cotter pin was not found after the incident, other related parts (namely, the washer and nut) were also not found after the incident, though Mr. Sommer does not contend that those parts were not installed or were incorrectly installed. (*Id.* at 8, 11, 14, 22). Defendant's counsel also had the following exchange with Mr. Sommer:

> Q.    How does the damage to the pin, the threaded pin, in and of itself indicate to you that the cotter pin was not installed by StandardAero in January 2019?
>
> A.    Well, what it indicates is that the nut was not installed. And the reason the nut wouldn't be installed is because the split pin or cotter key wasn't installed.
>
> Q.    Well, it indicates that the nut came off at some point, not that it wasn't necessarily installed –
>
> A.    Correct.

(*Id.* at 20–21). As a result, Defendant contends that Mr. Sommer's opinion about the cotter pin "is not based on any analysis or methodology, but rather speculation." (Doc. 60 at 7).

In rebuttal, Plaintiff points out that Mr. Sommer explained the analysis that he used to come to his conclusion. (Doc. 71 at 5). At his deposition, he stated:

> Q    And tell me, then, the basis for your opinion that the split pin was not installed.
>
> . . .

13

A The deformation of the pin, showing that it was loaded when there was no nut, washer – well, there's no nut or split pin installed, because you couldn't deform it if there was a split pin and a nut installed, the way it was deformed in the way we discussed.

The parts, as we talked about earlier, were looked for and never found.  The operator, Delta Private Jets . . . did an analysis with the NTSB and with the FAA, and they all came to the same conclusion, that those three parts were missing at that . . . the lack of those parts explained the nose gear not being able to be extended.

The photographs, the deformation . . . it all adds up, in my mind, to the same conclusion, which is that the parts weren't installed properly, and that's the only way those parts could have come off of there, if they were installed improperly – if they were installed improperly.

Q Or not at all?

A Or not – well, or not at all, sure.

(Doc. 60-2 at 13–14).

Mr. Sommer's report states that his methodology is based in part on the guidelines established by the International Civil Aviation Organization (ICAO) in its Manual of Aircraft Accident Investigation.  (Doc. 60-1 at 12).  Mr. Sommer explains that "[t]he ICAO manual is widely recognized as an authority for investigating aviation accidents and is used throughout the world by government agencies and private accident investigators."  (*Id.*)  He also states that his "methods of investigation and of forming opinions are consistent with the well-accepted procedures in the ICAO manual" and other "widely recognized manuals."  (*Id.*)  Finally, he states that he investigated the cause of the crash "by a combination of analysis of the pertinent evidence and by the process of elimination of other

14

potential causes." (*Id.*)  Mr. Sommer also states that he reviewed the following materials in preparing his opinion: (1) certification and registration; (2) depositions; (3) discovery; (4) FAA regulations and publications; (5) maintenance information; and (6) the NTSB report and docket.  (*Id.* at 14).  Defendant does not dispute that point but instead states, in a conclusory fashion, that Mr. Sommer's opinions are "speculative and unreliable."  (*See* Doc. 60 at 1).

Based on the evidence before the Court, Mr. Sommer used guidelines established by a "widely recognized authority for investigating aviation accidents." (Doc. 60-1 at 12).  Indeed, courts around the country have found that the methodologies in the ICAO manual are appropriate for assessing an aircraft accident.  *See, e.g., Johnson v. Avco Corp.*, 702 F. Supp. 2d 1093, 1102 (E.D. Mo. 2010) ("It is clear from reviewing Sommer's expert report and the other evidence . . . that Sommer did apply appropriate methodologies, including the International Civil Aviation Organization's (ICAO) Manual of Aircraft Accident Investigation . . . ."); *Boaz v. Vitatoe Aviation, LLC*, Case Number 21-11386, 21-11602, 21-11682, 2023 WL 4477127, at *6 (E.D. Mich. July 11, 2023) ("[T]here is no debate about the fact that the methods of investigation by the ICAO's Manual of Accident Investigation comprise widely accepted principles in the field of aircraft accident diagnosis."); *Rodgers v. Beechcraft Corp.*, 2016 WL 7971815, at *5 (N.D. Okl. Nov. 29, 2016), *aff'd*, 769 F. App'x 646 (10th Cir. 2018) (denying motion to exclude results of Mr. Sommer's pull force testing where his test methodology was based, in part, on guidelines established by the ICAO); *Eberli v. Cirrus Design Corp.*, 2009 WL

15

10667087, at *4 (S.D. Fla. June 5, 2009) (excluding Mr. Sommer's opinion but finding that "[t]he Court is willing to accept, for the purposes of this Order, that Mr. Sommer followed a generally accepted methodology set forth in . . . the International Civil Aviation Organization's Manual of Aircraft Accident Investigation . . . .").

Defendant also points out several cases in which Mr. Sommer's testimony was excluded.  But the Court finds each of these cases distinguishable from the present case.  In *Rodgers v. Beechcraft Corp.*, No. 15-CV-0129-CVE-PJC, 2017 WL 465474, at *9 (N.D. Okla. Feb. 3, 2017), the court found that Mr. Sommer "lacks the necessary qualification to testify about the design of the alternate landing gear" because Mr. Sommer "does not design aircraft or aircraft components as part of his profession."  *Id.* at *9.  In that case, the court concluded that plaintiffs failed to "show[] that Sommer has the necessary experience to testify about aircraft design." *Id.*  Here, Mr. Sommer is not testifying about a defect in the design of an airplane, but instead opines on what maintenance issue he believes caused an accident.  (*See* Doc. 60-1 at 13).  Moreover, the issue Defendant attempts to create with respect to Mr. Sommer's opinion is one of methodology, unlike the issue in *Rodgers*, which was about qualification.  Mr. Sommer's certification as an airframe and powerplant mechanic and his experience in "[a]nalysis and reconstruction of hundreds of General and Commercial aviation accidents" (Doc. 60-1 at 16) plainly qualify him to give his opinion as to the cause of this aviation accident.  *See Boaz*, 2023 WL 4477127, at *9 (finding that it is "beyond debate that Sommer's 50 years of

experience as a certified aircraft mechanic holding an Airframe & Powerplant (A&P) certification with Inspection Authorization (IA) amply qualifies him to opine about principles of aircraft engine and instrumentation operation and performance").  And Defendant does not argue otherwise.

In *Laugelle v. Bell Helicopter Textron, Inc.*, C.A. N10C-12-054 PRW, 2014 WL 5038142 (Del. Sup. Ct. Oct. 6, 2014), the court precluded Mr. Sommer's testimony that a power turbine governor in a helicopter was defectively designed, and that reasonably feasible alternative designs existed and could have been implemented because "Mr. Sommer possesse[d] no training or experience in aircraft component design relevant to [the] case" and "Mr. Sommer did not perform any testing regarding any proposed alternative designs."  *Id.* at *6.  Again, the main issue in *Laugelle* was about Mr. Sommer's qualification to testify about certain specified matters.  Mr. Sommer is not testifying about a defect in the design of an airplane, but instead opines on what maintenance issue he believes caused an accident, which this Court finds he is eminently qualified to do.  (*See* Doc. 60-1 at 13).  The court in *Laugelle* also noted that the proper methodology for proposing alternative designs (which is not at issue here) includes "more than just conceptualizing possibilities" and that Mr. Sommer's design suggestions were "speculative and do not comport with the standard for alternate design expert testimony."  *Laugelle*, 2014 WL 5038142 at *6.  Because Mr. Sommer's opinion in this matter does not include a suggestion with respect to an alternative design and Mr. Sommer used methodologies that the Court believes meet the standard for testimony on the cause

17

of an accident, the Court finds that the *Laugelle* opinion is inapposite to the matter before it.

In *Swanstrom v. Teledyne Cont'l Motors, Inc.*, 43 So. 3d 564 (Ala. 2009), the Alabama Supreme Court affirmed the trial court's decision to preclude Mr. Sommer from giving an opinion about what caused an in-flight fire because plaintiff did not produce evidence indicating that Mr. Sommer had any education and training in the area of fire causation or fire-origin analysis other than his general experience investigating aviation accidents that involved fires.  *Id.* at 580–81.  The appellate court also affirmed the trial court's decision to preclude Mr. Sommer from giving an expert opinion that toxic gases from an in-flight fire entered the cockpit of an aircraft causing plaintiff to become confused because plaintiffs did not produce evidence indicating that Mr. Sommer had any education, training, or experience related to the emission of toxic gases from fires caused by aviation fuel or the effects of such gases on individuals.  *Id.* at 581.  This, too, was an issue of qualification, which is not in question here.

*Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357 (S.D. Fla. 2009) is the only case that appears to be somewhat on point, but the Court remains unconvinced because the reasoning for excluding Mr. Sommer's opinion in that case do not apply to Mr. Sommer's opinion here.  In that case, the Court took issue with Mr. Sommer's opinion on an alternative design lacking "steps or a process," with the opinion being a conclusion at which jurors could arrive on their own and requires no scientific or specialized knowledge, and with Mr. Sommer speculating as to "additional potential

causes of the accident" where Mr. Sommer "admit[ted] that the evidence he reviewed [did] not support any of his purported secondary possibilities for causation." *Eberli*, 615 F. Supp. 2d at 1366–67. None of these criticisms apply to this matter. Here, Mr. Sommer explains that he investigated the cause of the crash "by a combination of analysis of the pertinent evidence and by the process of elimination of other potential causes." (Doc. 60-1 at 12). He also provides a list of the items he reviewed in coming to his conclusions. (*Id.* at 14). And Mr. Sommer explained at least once, during his deposition, more details about how he analyzed the accident:

> Well, a lot of it came from the reports of the two pilots, of Mr. Gilstrap and Mr. Ballew. Combining their statements with their depositions, I was able to get a pretty good handle on what their viewpoint of the accident was. In addition, we know what the flight path of the airplane was generally, where it started, where it was going, and where it ended.
>
> From there, I went into the mechanics of the landing gear system itself and how it works and what its condition was subsequent to the arrival of the aircraft without the benefit of the nose gear, and pieced it together and . . . I was able to make pretty good sense out of it.

(Doc. 72-4 at 24–25).

To be sure, Mr. Sommer's expert report is not the model for clarity when it comes to the methodology he used. "But experts and their opinions need not be perfect to be admissible." *Tall v. Fed. Ins. Co.*, Case No. 6:20-cv-1125-RBD-LRH, 2021 WL 7629423, at *3 (M.D. Fla. May 5, 2021) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). Where evidence is

admissible but shaky, as it is here, the Eleventh Circuit has found that the appropriate means of attack are "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." *Quiet Tech CD-8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). While the issues that Defendant raises with Mr. Sommer's expert report may be fodder for cross-examination and may decrease the weight and credibility of his opinion, Mr. Sommer's method is not so unreliable that the Court can rule as a matter of law that the jury should not hear his opinion.

In sum, the Court finds that, based on the evidence currently before it, Mr. Sommer's opinion is more likely than not based on methodology that can properly be applied to the issues in this matter. Accordingly, the Court denies the Sommer *Daubert* Motion. Such denial is without prejudice, however, to Defendant renewing its motion as a motion in limine closer to trial and requesting a *Daubert* hearing at that time, should it wish to do so.

## II. Summary judgment motion

"The elements of a negligence claim under Florida law are: (1) a legal duty on the defendant to protect the plaintiff from particular injuries; (2) the defendant's breach of that duty; (3) the plaintiff's injury being actually and proximately caused by the breach; and (4) the plaintiff suffering actual harm from the injury." *Zivojinovich v. Barner*, 525 F.3d 1059, 1067 (11th Cir. 2008) (citing *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003)). Defendant argues that Plaintiffs cannot prevail on their negligence claims because there is no evidence

that Defendant breached a legal duty or that Plaintiffs suffered damages from the incident.  (Doc. 62 at 6–7).

With respect to breach of legal duty, Defendant states that "[t]he only evidence Plaintiffs can furnish in support of their claim that StandardAero performed improper maintenance is the speculation of their accident reconstruction expert, Donald E. Sommer."  (*Id.*)  Defendant argues that "[f]or reasons fully set forth in StandardAero's *Daubert* motion, this opinion is wholly unreliable."  (*Id.* at 8).  As set forth in the Court's consideration of the Sommer *Daubert* Motion, the Court disagrees.  Defendant then argues that "even if the Court declines to exclude Sommer's opinions, those opinions alone cannot establish StandardAero's alleged improper maintenance."  (*Id.* at 9).  While that could prove to be detrimental to Plaintiffs' case during trial, for purposes of a summary judgment, the Court must view the facts in the light most favorable to Plaintiffs.  Here, viewing the facts in the light most favorable to Plaintiffs, the Court concludes that there is an issue of material fact as to whether StandardAero improperly maintained the Aircraft such that it breached its duty to Plaintiffs.  (*See* Doc. 62-9 at 13 ("The cotter pin designed to retain the castellated nut for the nose gear drag link was not installed as required in the maintenance instructions and as required for safe operation of the aircraft . . ..").  Moreover, Defendant argues that "[u]ndisputed evidence indicates that StandardAero performed maintenance on the NLG in accordance with required procedures."  (Doc. 62 at 10).  But the evidence is disputed by Mr. Sommer's expert report.  (*See* Doc. 62-9 at 13 ("StandardAero failed to follow the manufacturer's

maintenance instructions published by the airframe manufacturer . . . .").   In sum, while the Court agrees that the record is undisputed as to there being a record of StandardAero performing maintenance, whether the maintenance was performed properly is disputed by Mr. Sommer's expert testimony.

Finally, Defendant argues that Plaintiffs have not shown any evidence of any damages other than loss of earnings. (Doc. 62 at 13).  But that's simply not true. For example, Defendant admits that Mr. Ballew testifies that he suffered "back and neck pain, headaches, bruising" and "things of that nature" during the landing.  (*Id.* at 13–14); (*see also* Doc. 72-5 at 136 ("The physical injuries are the back and neck pain, headaches, bruising, things of that nature, that were incurred, you know, during the landing and subsequently getting out of the aircraft.")).  And Defendant also admits that Mr. Gilstrap claims that he suffered "sore muscles, aches and pains" after the incident.  (Doc. 62-6 at 7 ("[T]he impact was solid. . . . I remember the restraint system holding us and heads going forward.  There were . . . sore muscles, aches and pains, typical with the down forces applied with the nose gear at a higher than normal rate of descent.")).  Defendant also states that "Plaintiffs' claims for mental anguish are supported by nothing more than the allegations in their Complaint and self-serving deposition testimony."  (Doc. 62 at 16).  Even if their deposition testimony is "self-serving," however, Defendant points to no case law or other rule indicating that deposition testimony is irrelevant or should not be considered on summary judgment if it is self-serving.  *Cf. United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) ("An affidavit cannot be conclusory . . . but nothing in

Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving.  Indeed, . . . most affidavits submitted in response to a summary judgment motion are self-serving.").  The Eleventh Circuit has explained that "a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *Id.* (citation omitted); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [plaintiff]s sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."); *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir.) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."), *modified on other grounds on denial of reh'g*, 425 F.3d 1292 (11th Cir. 2005).  Defendant also brings up that Mr. Ballew and Mr. Gilstrap never disclosed any physical ailments or injuries to the Federal Aviation Administration as part of their medical certificate renewal process, even though they would have been required by law to do so and that they did not see doctors for their injuries or take medications other than ibuprofen.  (Doc. 62 at 14–15; Doc. 62-6 at 7–8; Doc. 62-4 at 4, 10–12).  This evidence may cast doubt on Plaintiffs' deposition testimony, but it does not erase their testimony.  Although the Court has doubts as to the injuries claimed here, viewing the facts in the light most favorable to Plaintiffs, the Court must leave it to a jury to credit or discredit Plaintiffs' testimony as to their purported physical injuries.

In sum, Defendant's argument that Plaintiffs have not shown *any* evidence of damages is incorrect and the Court declines to grant summary judgment on that

basis.  To be clear, the Court's ruling is extremely narrow: Defendant has failed to show that there is no evidence of damages.  Defendant did not argue that any of the damages were unsupported as a matter of law—just that there was no evidence that Plaintiffs suffered any damages.  Thus, the Court did not consider whether any of the damages claims were unsupported as a matter of law.  The Court denies the Clark *Daubert* Motion without prejudice at this time, subject to the Clark *Daubert* Motion and any other motions in limine related to damages being brought before the Court at the appropriate time before and during trial.

## CONCLUSION

A final note:  the Court strongly recommends that the parties enter settlement negotiations before additional litigation expenses are incurred.  Should the Court be notified by the parties—via the filing of a joint notice—that they would like to re-engage in settlement negotiations, the Court would be inclined to stay existing deadlines and trial term for the parties to conduct good faith settlement negotiations.  Furthermore, the Court would be amenable to providing the parties a settlement conference before a United States Magistrate Judge if requested by the parties.  Again, after careful consideration of the *entire* record and all pleadings here, the parties may want to reconsider an amicable settlement.

In all events, for the reasons set forth above,

1. Defendant's Motion for Summary Judgment (Doc. 62) is **DENIED**.

2. Defendant's *Daubert* Motion to Exclude Opinions and Testimony of Donald E. Sommer (Doc. 60), Defendant's *Daubert* Motion to Exclude Expert Opinions

and Testimony of William M. Clark, Ph.D. (Doc. 61), Plaintiff's (Corrected) *Daubert* Motion to Preclude Testimony from Defendants' Proposed Expert Witness Paris Michaels (Doc. 64), Plaintiff's *Daubert* Motion to Preclude Testimony from Defendants' Proposed Expert Economic Cynthia Stephens (Doc. 65), and Plaintiffs' *Daubert* Motion to Preclude Testimony from Defendants' Proposed Expert C. Dennis Moore are **DENIED without prejudice** to being brought as motions in limine at the appropriate time in accordance with the dates set forth in the Court's Amended Case Management and Scheduling Order (Doc. 76).

3. Plaintiff's *Daubert* Motion to Preclude Testimony from Defendants' Proposed Expert Witness Paris Michaels (Doc. 63) is **DENIED as moot** in light of Plaintiff's (Corrected) *Daubert* Motion to Preclude Testimony from Defendants' Proposed Expert Witness Paris Michaels (Doc. 64).

**ORDERED** at Fort Myers, Florida on January 23, 2024.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE